UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MICHAEL D. JULIAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:13-CV-2167-RLW |
| ) | |
| CAROLYN COLVIN, ) | |
| ACTING COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's final decision denying Michael D. Julian's ("Julian") application for disability insurance benefits under Title II of the Social Security Act. Julian alleges disability due to inoperable cysts on his spine, emphysema, COPD, and a mass on his lung. (Tr. 23).[1]

**I.   Background**

On March 4, 2011, Julian filed his application for a Period of Disability, Disability Insurance Benefits and Supplemental Security Income ("SSI"), alleging disability beginning February 1, 2007. The Commissioner denied Julian's Application initially on April 19, 2011, and Julian filed his request for a hearing on May 13, 2011. On August 13, 2012, Julian amended his onset to date to January 15, 2010. On August 27, 2012, Julian appeared for a hearing before an Administrative Law Judge ("ALJ").

---

[1] The Court notes that the transcript numbers cited by Plaintiff do not correspond to the transcript (ECF No. 13) on file with the Court, which has made it difficult for the Court to verify Julian's citations.

In the ALJ's decision, dated September 24, 2012, the ALJ denied Julian's Application for benefits. On October 4, 2012, Julian timely filed his Request for Review of Hearing Decision. The Appeals Council denied Julian's Request for Review, leaving the ALJ's decision as the final decision in the case and exhausting Julian's administrative remedies.

## II.     Decision of the ALJ

The ALJ determined that Julian has the following severe impairments: lumbar pain, chronic obstructive pulmonary disease (COPD), depression with anxiety, and polysubstance abuse. (Tr. 13). The ALJ found that Julian does not suffer from an impairment or combination of impairments of a severity that meets or medically equals the required severity of a listing. (Tr. 21). The ALJ found that Julian retained the residual functional capacity (RFC) to perform light work, except limited to understanding, remembering, and carrying out at least simple instructions and non-detailed tasks; and, no performing work which includes more than infrequent handling of customer complaints. (Tr. 22). The ALJ determined Julian could perform his past relevant work as a duplicating machine operator or, in the alternative, that Julian retained the RFC to perform the full range of light work. (Tr. 25-26).

## III.    Administrative Record

The following is a summary of relevant evidence before the ALJ.

### A.     Hearing Testimony

#### 1.     Julian's Testimony

Julian testified on August 27, 2012 as follows.

Julian lives in an apartment in St. Charles, Missouri with his sister and fifteen year old nephew. (Tr. 35). Julian has three years of college but has not taken any classes by computer or correspondence. (Tr. 35). In the early 2000s, he tried to be an artist. (Tr. 36). He worked as a

2

crew member for Burger King in 2010 and for McDonald's in 2009. (*Id.*) He worked for Monsanto as an account manager, managing up to 60 people. (Tr. 37-38). He was a manager at Jack-in-the Box. (Tr. 38). He received unemployment benefits in 1995 or 1996. (Tr. 39). He was in prison from February 2007 through March 2008 for fraudulently attempting to obtain a controlled substance. (Tr. 39). He was also in jail before that. (Tr. 39).

Julian did one 180-day drug treatment program through the Department of Corrections but has not done any other treatment programs. (Tr. 39). He has never been hospitalized for alcohol or drugs. (Tr. 40).

Julian has been seeing a psychiatrist, Dr. Baram, since September 2011. (Tr. 40). He was hospitalized then at the St. Vincent DePaul hospital. (Tr. 40). He has been hospitalized about five or six times for suicidal attempts and depression; he claims they were not drug related. (Tr. 40-41). He was hospitalized also at St. John's Mercy Hospital for depression. (Tr. 41). He was hospitalized at St. Luke's for a mass on his left leg and emphysema. (Tr. 41).

He stopped smoking a pack of cigarettes per day about eight months ago. (Tr. 41-42). He now smokes about 10 cigarettes per day. (Tr. 42).

He has cysts on his spine, his L3-L5, that cause pain in his spine and legs. (Tr. 42-43). He takes OxyContin twice a day. (Tr. 43). It makes him tired. He has to nap once a day. He doesn't drive very often. (Tr. 43). His sister drove him to the hearing and drives him to his doctor's appointments and the ER. (Tr. 43-44).

His psychiatrist is treating him for chronic depression. (Tr. 44). He has suicidal thoughts and attempted to cut his wrists in 2011. (Tr. 44). He takes Cymbalta, Prozac and Ambien. (Tr. 44).

On a typical day, he wakes up at 7:00 a.m., gets cleaned up, gets dressed, takes his medication, and prepares a meal for himself. (Tr. 45). About four or five days a week he doesn't get dressed all day. (Tr. 45).

He enjoys drawing and painting, but hasn't done that since February 2008 or 2009. (Tr. 45-46). He doesn't belong to any organizations. He has a couple of close friends, whom he sees every couple months. (Tr. 46). He doesn't go out for enjoyment, doesn't go grocery shopping, and doesn't do laundry. (Tr. 47). He doesn't go grocery shopping because he doesn't have money.

### B.     Medical Records

Julian's relevant medical records are summarized as follows:

On August 17, 2009, Julian began treatment with Hector Pineda, D.O. (Tr. 716-43, 1159-1176). He reported that he had a cyst on his spine that had been causing low back pain and both legs to hurt. (Tr. 743.) Dr. Pineda saw Julian on August 17, 2009, September 14, 2009, October 12, 2009, October 26, 2009, November 23, 2009, December 18, 2009, January 14, 2010, February 4, 2010, February 23, 2010, March 18, 2010, April 6, 2010, April 13, 2010, April 29, 2010, May 18, 2010, May 25, 2010, June 22, 2010, July 23, 2010, August 10, 2010, August 17, 2010, September 14, 2010, September 28, 2010, October 12, 2010, October 26, 2010, November 9, 2010, December 7, 2010, January 4, 2011, February 4, 2011, March 4, 2011, April 1, 2011, April 26, 2011, May 24, 2011, June 17, 2011, July 12, 2011, August 9, 2011, September 7, 2011, October 3, 2011, October 31, 2011, November 23, 2011, December 21, 2011, January 16, 2012, February 15, 2012, March 12, 2012, April 9, 2012, May 5, 2012, May 30, 2012, and June 27, 2012. Almost all of these visits were listed as "routine" visits. Dr. Pineda diagnosed Julian primarily with spinal cord compression, meningeal cysts, tobacco abuse, and hypothyroidism.

4

During the period of alleged disability, Julian repeatedly went to the emergency room (ER) and had other hospital visits, complaining of pain, respiratory ailments, and psychological issues.

On April 5, 2011, Dr. Mary MacNaughton performed a Physical Residual Functional Capacity Assessment, which indicated limitations including lifting 20 pounds occasionally and less than 10 pounds frequently, standing/walking 6 hours in an 8 hour workday, and sitting about 6 hours in an 8 hour workday. (Tr. 746-751).

On April 7, 2011, Dr. Shannon Nanna conducted a psychological evaluation of Julian. (Tr. 754-57). Dr. Nanna determined that Julian had only mild impairment in activities of daily living, moderate impairment as to social functioning, no impairment as to his appearance and ability to care of his personal needs, and no impairment as to concentration, persistence and pace. Dr. Nanna assigned Julian a GAF score of 65.

On April 18, 2011, Dr. Barbara Markway performed a Psychiatric Review of Julian's records. (Tr. 758-69). She determined that he has an affective disorder but his medical impairments were not severe. She noted that Julian frequently uses the ER for physical impairments but fails to follow through in finding a primary care physician. Julian admitted working 5-10 hours at McDonald's, doing household chores, and checking out books from the library. She found his allegation of functional impact to be only partially credible and not fully consistent with recent mental status examinations or noted abilities.

On June 21, 2012, Dr. Vadim Baram filled out a Mental Medical Source Statement. (Tr. 770-73). Dr. Baram diagnosed Julian with major depression, severe, recurrent; chronic pain disorder with psychological and psychological factors; hypertension and hyperthyroidism; and poor coping skills. (Tr. 773). Dr. Baram opined that Julian had marked limitations in all areas of

5

activities of daily living, social functioning, and concentration, persistence and pace. Dr. Baram believed that for zero to two hours each day Julian could 1) apply common sense understanding to carry out simple one- or two-step instructions; 2) appropriately interact with co-workers, 3) appropriately interact with supervisors, and 4) appropriately interact with the public. Dr. Baram also opined that Julian's psychological symptoms would cause him to miss three times a month or more.

Julian was admitted to St. Joseph Health Center from July 2 through July 12, 2011 because of increased pain and "passive death wishes." (Tr. 774-801).

On March 16, 2012, Julian underwent a CSS Assessment by Crider Health Center. (Tr. 1364-1379). He was diagnosed with schizoaffective disorder-severe and emphysema and hypertension. He was assigned a GAF of 45.

On July 19, 2012, Julian was seen at Mercy with suicidal thoughts. (Tr. 1380-1403). He was diagnosed with major depression-severe and chronic pain. He was assigned a GAF of 35/55. (Tr. 1395).

### IV. Legal Standard

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as

"any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities ... ." *Id.* "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001)).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. *Id.*

Fourth, the impairment must prevent claimant from doing past relevant work.[2] 20 C.F.R. §§ 416.920(e), 404.1520(e). At this step, the burden rests with the claimant to establish his RFC. *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008); *see also Eichelberger*, 390 F.3d at 590-91; *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e). The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f). If it is found that the claimant can still perform past relevant work, the claimant will not be found to be disabled. *Id.*; 20 C.F.R. § 416.920(a)(4)(iv). If the claimant cannot perform past relevant work, the analysis proceeds to Step 5.

---

[2] "Past relevant work is work that [the claimant] has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it." *Mueller v. Astrue*, 561 F.3d 837, 841 (8th Cir. 2009) (citing 20 C.F.R. § 404.1560(b)(1)).

7

At the fifth and last step, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work. 20 C.F.R. § 416.920(a)(4)(v). If it is found that the claimant cannot make an adjustment to other work, the claimant will be found to be disabled. *Id.*; *see also* 20 C.F.R. § 416.920(g). At this step, the Commissioner bears the burden to "prove, first that the claimant retains the RFC to perform other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to perform." *Goff*, 421 F.3d at 790; *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). The Commissioner must prove this by substantial evidence. *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983).

If the claimant satisfies all of the criteria of the five-step sequential evaluation process, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." *Id.*; *see also Harris v. Barnhart*, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)).

This court reviews the decision of the ALJ to determine whether the decision is supported by "substantial evidence" in the record as a whole. *See Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir. 1994). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Therefore, even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the ALJ's decision must be affirmed if it is supported by substantial evidence. *Clark v. Heckler*, 733 F.2d 65, 68 (8th Cir. 1984). In *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions,

8

thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

As such, "[the reviewing court] may not reverse merely because substantial evidence exists for the opposite decision." *Lacroix v. Barnhart*, 465 F.3d 881, 885 (8th Cir. 2006) (quoting *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996)). Similarly, the ALJ decision may not be reversed because the reviewing court would have decided the case differently. *Krogmeier*, 294 F.3d at 1022.

## V. Discussion

### A. RFC Finding

Julian complains that no RFC finding was made based upon the substantial medical evidence. Julian contends that the RFC was must be supported by evidence from a medical professional and argues that "[a] conclusion regarding credibility is not the equivalent of proving by medical evidence that a claimant has the RFC for other work." (ECF No. 14 at 8). Julian argues that the ALJ erred by failing to consider the effect of Julian's unscheduled absenteeism due to his impairments. (ECF No. 14 at 8-10). Julian argues that the ALJ did not determine that the number of hospital stays was due to malingering or was a credibility issue. (ECF No. 10 at 20). Instead, Julian states that the ALJ improperly focused on his alleged opiate addiction.

In response, the government argues that the ALJ properly determined Julian's RFC after evaluating the medical evidence and Julian's credibility. The ALJ noted that the medical evidence showed Julian had an opiate dependency and a pattern of drug-seeking behavior. (ECF No. 19 at 5 (citing Tr. 23, 385, 413, 432, 451, 503, 530, 541, 564, 591, 596, 609, 615, 621, 627, 692, 702, 774, 1028, 1181, 1199, 1216, 1222, 1243, 1333, 1355)). When frequenting ERs, Julian often denied taking medications, but checks with pharmacies revealed recently-filled prescriptions for opiates. (ECF No. 19 at 5-6 (citing Tr. 14, 19, 23, 385, 403, 503-25, 541-47,

9

564-78, 596-601, 961-62, 1028-1040, 1042, 1253)). Julian was described by medical professionals as being focused on obtaining narcotics and "obviously opiate dependent." (ECF No. 19 at 6 (citing Tr. 18-19, 23, 792-95, 925, 929). Julian also testified that he went to prison from February 2007 through March 2008 for illegally attempting to obtain a controlled substance. (Tr. 23, 39). Julian also gave different medical histories to ER attending physicians. He sometimes claims he had spinal surgery, and other times denied such surgery. (ECF No. 19 at 6 (citing Tr. 15, 23, 385, 413, 616, 1181, 1216)). The ALJ found no objective evidence, including no imaging studies, that Julian had inoperable tumors on his spine. (Tr. 15, 18, 23, 385, 413, 616, 1181, 1216)). The government also claims that the objective medical evidence does not support Julian's allegations of disabling pain and limitation, which the ALJ considered as part of determining Julian's credibility. (ECF No. 19 at 6-7). The ALJ noted that imaging studies showed some abnormalities, including a perineural cyst at L4-5 and L5-S1. (ECF No. 19 at 7 (citing Tr. 14, 23, 392, 572-73)). Julian's physical examinations showed low back tenderness at time and some muscle spasms, but his range of motion in his back and extremities was generally noted to be "normal," he had no neurological deficits, full muscle strength and tone, and straight leg raise testing was negative. (ECF No. 19 at 7 (citing Tr. 14-20, 386, 414, 427, 537, 546, 571-72, 598, 611, 623, 694, 926, 1031, 1045, 1069, 1075, 1109, 1123, 1130, 1196, 1217-18, 1244, 1261, 1362, 1409)).

With respect to any respiratory impairment, Julian did not allege any functional limitations because of these impairments in his disability report or during the administrative hearing. (ECF No. 19 at 7 (citing Tr. 32-50, 165-72)). The government contends that the mere diagnosis of an impairment is not evidence of any functional limitation. (ECF No. 19 at 7 (citing *Weber v. Barnhart*, 348 F.3d 723, 725 (8th Cir. 2003)(claimant could perform her past relevant

10

work despite cirrhosis of the liver)). The government points out that Julian did not seek regular treatment for any of his alleged impairments and did not have a primary care physician. (ECF No. 19 at 7 (citing *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003)("the ALJ concluded, and we agree, that if her pain was as severe as she alleges, [claimant] would have sought regular medical treatment")).

The government points out that Julian was hospitalized on a few occasions in the summer of 2010 for pneumonia after arriving at the ER. (ECF No. 19 at 7 (citing Tr. 648-68, 1333-34)). A chest CT scan in July 2010 showed pulmonary infiltrates and changes of emphysema, but no obvious mass or tumor. (Tr. 1336-37). A bronchial wash was negative for malignancy. (Tr. 1338). In November 2010, he presented to the ER for bronchitis and pneumonia. (Tr. 692-96, 1274-1304). On December 21, 2010, a PET scan showed a left lung lesion. (ECF no. 19 at 8 (citing Tr. 17, 1274-75)). Julian was instructed to establish a relationship with a primary care physician to address his conditions and to discontinue smoking, but the record does not indicate that he followed up or established a relationship with a primary care physician, and that he continued to smoke cigarettes. (ECF No. 19 at 17, 14-15, 23, 393, 416, 443, 452, 458, 508, 538, 544, 574, 611, 618, 626, 708, 774, 1267, 1362, 1417)). The ALJ noted that one would expect someone complaining of spinal tumors to obtain treatment. (ECF No. 19 at 8 (citing Tr. 24)). Although Julian claims that he did not obtain a primary care physician because he could not afford it, the ALJ noted that there is no evidence that Julian was ever denied treatment because he could not pay and no indication that Julian sought treatment available to indigents. (ECF No. 19 at 8 (citing 23)). One attending physician gave Julian a list of free clinics to choose a doctor. (ECF No. 19 at 8 (citing Tr. 1042)). The ALJ also pointed out that Julian smoked one to two packs of cigarettes per day and occasionally purchased marijuana, as an indication that economic

justifications were not the reason Julian failed to obtain a primary care physician. (ECF No. 19 at 8-9 (citing Tr. 23, 414, 451, 925, 1030, 1108, 1251, 1280, 1333)); *Riggins v. Apfel*, 177 F.3d 689, 693 (8th Cir. 1999)(finding complaints of disabling pain not credible where "[a]lthough [claimant] claims he could not afford such medication, there is no evidence to suggest that he sought any treatment offered to indigents or chose to forgo smoking three packs of cigarettes a day to help finance pain medication"). In addition, the ALJ found Julian's part-time work to be inconsistent with allegations of disabling pain. (ECF No. 19 at 9 (citing Tr. 24, 187, 420, 456, 536-37, 571, 615, 1276, 1308, 1336, 1354)); *Harris v. Barnhart*, 356 F.3d 926, 930 (8th Cir. 2004)("It was also not unreasonable for the ALJ to note that [claimant's] daily activities, including part-time work, cleaning house, attending church, and dining out with her boyfriend, were inconsistent with her claim of disabling pain.").

With respect to Julian's mental impairments, the ALJ noted that Julian also did not seek regular mental health treatment. (ECF No. 19 at 9 (citing Tr. 23)). Instead, he sought treatment from hospitals with complaints of depression and suicidal ideation; he was also focused on obtaining narcotic medication. (ECF No. 19 at 9 (citing Tr. 18, 789-92, 803, 815, 865, 910-33)). The government claims that the absence of any evidence of ongoing counseling or psychiatric treatment or of deterioration or change in Julian's mental capabilities disfavors a finding of disability. (ECF No. 19 at 9; *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000)(citing *Dixon v. Sullivan*, 905 F.2d 237, 238 (8th Cir.1990)("The absence of any evidence of ongoing counseling or psychiatric treatment or of deterioration or change in Roberts's mental capabilities disfavors a finding of disability."). The government notes that Julian only began seeing Dr. Baram in 2012—several years after his alleged disability onset date. (ECF No. 19 at 10 (citing Tr. 844-45, 960, 1272-73)). The ALJ also found that, although he was admitted on several occasions for

suicidal thoughts, Julian responded well to treatment, including antidepressant medication, and was discharged in much improved conditions. (ECF No. 19 at 10 citing Tr. 18-20, 23, 910, 1060, 1113)). Thus, the government claims that the ALJ properly determined that Julian's mental impairment was not disabling because it could be controlled by medication. (ECF No. 19 at 10 (citing *Brown v. Astrue*, 611 F.3d 941, 955 (8th Cir. 2010); *Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir.2009)("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.").

The government notes that the Plaintiff had a "normal" psychiatric examination when he regularly presented to the ER for complaints of back pain. (ECF No. 19 at 11 (citing Tr. 427, 448, 520, 537, 572, 597, 611, 616, 622, 628, 1032, 1123, 1200, 1285, 1360)). In addition, the ALJ relied on consultative psychologist Dr. Nanna's evaluation, which showed that Julian's mood was depressed but otherwise had mild abnormalities and had a GAF of 65. (ECF No. 19 at 11 (citing Tr. 755-57)). Based upon this evidence, the government claims that the ALJ properly gave Dr. Baram's opinion that Julian had "marked" limitations and a GAF in the 30s no weight. (ECF No. 19 at 10-11). The ALJ stated that Dr. Baram's opinion was inconsistent with the records, particularly Dr. Baram's own hospital records which suggested possible malingering, secondary gain, and easy access to opiates. (ECF No. 19 at 10 (citing Tr. 24, 690-62)). In addition, Dr. Baram did not account for opiate dependency. (ECF No. 19 at 10).

The ALJ also considered the opinions of state agency physician, Dr. Mary MacNaughton, and state agency psychologist, Dr. Barbara Markway. (ECF No. 19 at 11 (citing Tr. 24, 746-52, 758-69)). Dr. MacNaughton opined that Julian retained the ability to perform light work activity but could never climb ladders, and could occasionally kneel, stoop, and crouch. (Tr. 24, 746-52). Dr. MacNaughton explained that while Julian's impairments could cause come pain and

limitation with bending, but his alleged limitations were greater than the medical evidence would suggest. (Tr. 752). Dr. Markway discerned, based upon the evidence that Julian had only "mild" limitations and that his mental impairments were not "severe." (Tr. 24, 758-69). The government claims that because the ALJ found Julian non-credible and gave good reasons for the findings, then the Court must defer to the ALJ's findings. *See Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir. 2007); *Gregg v. Barnhart*, 354 F.3d 710, 713 (8th Cir.2003)("If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination.").

Finally, the government contends that the ALJ properly considered Julian's subjective complaints in making credibility determinations regarding Julian's purported need for excessive absenteeism as demonstrated by his numerous ER visits and hospitalizations. (ECF No. 19 at 12). The government maintains that the ALJ included only those limitations she considered credible in formulating the RFC and did not include absences and hospitalizations that were due to Julian's "drug seeking behavior, his non-compliance with treatment recommendations, and the fact that his mental state in particularly consistently improved with treatment." (*Id.*)

The Court agrees with the ALJ's determination that the medical records demonstrate that Julian does not have a severe physical medical impairment. Although Julian highlights out-of-context examples from the record which suggest that his symptoms might be disabling, the overwhelming evidence in the record indicates that Julian exaggerated the severity of his impairments and made inconsistent claims throughout the relevant period. For example, there is no medical evidence to support Julian's claim that he had inoperable tumors on his spine. *See Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)(holding claimant was not disabled where "[t]he ALJ also noted that although Black does experience some limitation, pain, and discomfort, she

has never undergone surgery and has relied on a conservative course of treatment, including exercises, home cervical traction, a back brace, and medication"). When Julian complained of pain, he responded very well to pain medication and treatment. Medical professionals also indicated that Julian's physical impairments were not disabling. Dr. MacNaughton opined that Julian retained the ability to perform light work activity, but could never climb ladders, and could occasionally kneel, stoop and crouch, and these limitations were included in the RFC. Dr. MacNaughton also believed that Julian's reported pain was exaggerated. A finding of greater ability is also supported by Julian's daily activities, particularly his part-time employment. The Court agrees that the evidence suggests that Julian's pain has responded well to treatment, it is non-disabling. *See Browning v. Sullivan,* 958 F.2d 817, 821 (8th Cir.1992) ("We will not disturb the decision of an ALJ who seriously considers, but for good reasons explicitly discredits, a claimant's testimony of disabling pain."). Likewise, the evidence indicates that Julian failed to seek pain management and treatment, which would be expected of disabling pain. Although Julian claims that his failure to seek routine treatment is based upon his financial condition, the Court notes that free treatment providers were offered to Julian, which he apparently did not pursue, and that Julian had money for cigarettes and marijuana. Julian's failure to seek regular treatment for his alleged impairments weighs against his credibility as far as the severity of these impairments. The Court holds that ALJ was able to discount Julian's subjective medical complaints by reading the medical record and evaluating the objective medical evidence.

The Court also believes that the medical records did not indicate that Julian's mental problems were severe. Julian's mental status exams were consistently normal when he presented to the ER for treatment for back pain. Dr. Nanna opined that Julian had "mild" limitations in activities of daily living, "moderate" limitations in social functioning, and no limitations in

concentration, persistence and pace. Dr. Markway reviewed the evidence and found that Julian had only mild limitations and that his impairments were not severe. When Julian was discharged from the ER and/or hospital for psychiatric treatment, he was always in much improved condition and had normal affect and thought processes, with no delusions, hallucinations or suicidal thoughts. Julian's records indicate that his mental impairments could be treated by medication. Further, it appears that it was not until late in the process that Julian pursued any regular treatment for his mental health with Dr. Baram. Even this treatment, however, included indications that Julian was an opiate-seeker and a malingerer. Therefore, the Court holds that the ALJ properly discounted the opinion of Dr. Baram because it was not in keeping with the majority of Julian's medical records and failed to account for Julian's opiate addiction.

Lastly, the Court finds that the ALJ properly determined Julian's RFC, even considering his excessive absenteeism. Throughout the ALJ's opinion, she discredits Julian's reasons for hospitalizations, citing his drug seeking behavior, failure to find a primary care physician, and non-compliance with his mental health medications and treatment. *See Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)("Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility."). The ALJ accounted for his excessive hospitalizations by discrediting the reasons for Julian's hospitalizations and admissions and relying on the opinions of medical professionals that Julian's impairments were not severe. Thus, the Court finds that the ALJ properly included only those limitations which were credible in formulating Julian's RFC, which did not include an excessive absenteeism limitation.

B.  Dr. Pineda's medical records

Julian contends that the ALJ erred by not considering or acknowledging Dr. Hector Pineda's medical records and opinion when making her RFC decision. (ECF No. 14 at 10-11).

Specifically, Julian maintains that the records of Dr. Pineda revealed Julian was diagnosed with meningeal cysts and had a diagnosis of "spinal cord compression." (ECF No. 14 at 10-11 (citing Tr. 780-81, 788-89, 793, 791-792, 1226-29)). Julian contends that the ALJ's failure to discuss this evidence renders the ALJ's findings and conclusions unsupported by substantial evidence.

In response, the government contends that "[t]he fact that the ALJ did not expressly discuss Dr. Pineda's records in her decision does not mean that she did not consider the evidence." (ECF No. 19 at 13 (citing *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010)("Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted."). The government notes that that ALJ discussed Julian's complaints of "severe low back pain due to cysts located in his lower spine" and that a CT scan showed an "enlargement of the lumbosacral spinal canal consistent with a lobulated perineural cyst." (Tr. 14).

The Court holds that the ALJ's failure to explicitly discuss Dr. Pineda's records does not mean that her opinion was not supported by substantial evidence. *See Black v. Apfel*, 143 F.3d 383, 386 (8th Cir.1998)("[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered."). Julian only cites to Dr. Pineda's records to support a finding that he had back pain and cysts. The ALJ included such a finding in her opinion. The ALJ need not cite to every piece of evidence in the record to support her opinion. Therefore, the Court holds that the mere omissions of a discussion of Dr. Pineda's medical records does not support a finding that the ALJ's opinion was not supported by substantial evidence.

C.  Disability Determination At Steps Four and Five

The ALJ determined that Julian had past relevant work as a duplicating machine operator. Julian contends that his work as a duplicating machine operator was not past relevant work

because it was not performed at the substantial gainful activity level and could not be used as a basis for a denial at step four of the process. (ECF No. 14 at 12). Julian also maintains that the ALJ cannot make an "alternative" decision that he could perform other work. Julian argues that such an "alternative" finding is improper because a claimant has a due process right to know the grounds for an agency decision. (ECF No. 14 at 13-14 (citing *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 93-94 (1943)).

In response, the government asserts that, even if Julian's work as a duplicating machine operator was not performed at the substantial gainful activity level, the vocational expert at the hearing determined that Julian could perform other work such as an order caller, mail sorter, and hand presser. (ECF No. 19 at 13 (citing Tr. 25-26)). The government maintains that, contrary to Julian's contention, the Commissioner can offer alternative dispositions based on what would have been concluded at subsequent steps in the process. (ECF No. 19 at 14). If an ALJ reaches a finding at Step Four that is not supported by the evidence, then the ALJ's finding at Step Five will be upheld. (ECF No. 19 at 14 (citing *Tommasetti v. Astrue*, 533 F.3d 1035, 1042 (9th Cir. 2008)("Although the ALJ's step four determination constitutes error, it is harmless error in light of the ALJ's alternative finding at step five."))).

The Court finds that the ALJ properly made an alternative finding at Step Five that Julian could perform other work. Julian does not cite to any specific case that precludes alternative findings in the social security context. Rather, the case law indicates that such alternative findings are permissible, particularly to avoid wasting valuable agency and judicial resources. *See Tommasetti*, 533 F.3d at 1042; *Murrell v. Shalala*, 43 F.3d 1388, 1389 (10th Cir. 1994)("We thus not only specifically reject plaintiff's objection to the ALJ's alternative disposition here, but expressly reaffirm our favorable view of such dispositions generally."). Indeed, the Court finds

that Julian's due process rights were not violated because the ALJ clearly provided the bases for her decision, including her finding that Julian could perform other work. Therefore, the Court affirms the ALJ's finding of no disability.

## VI. Conclusion

Based on the foregoing, the Court finds that the ALJ's decision was based on substantial evidence in the record as a whole and should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that this action is **AFFIRMED**. A separate Judgment will accompany this Order.

Dated this 18th day of March, 2015.

*Ronnie L. White*
RONNIE L. WHITE
UNITED STATES DISTRICT JUDGE